J-S23041-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| MICHAEL WHITMIRE | : | |
| | : | |
| Appellant | : | |
| | : | No. 2694 EDA 2015 |

Appeal from the Judgment of Sentence May 1, 2015
in the Court of Common Pleas of Philadelphia County Criminal Division
at No(s): CP-51-CR-0001673-2014

BEFORE: PANELLA, OTT, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:                    **FILED April 21, 2016**

Appellant, Michael Whitmire, appeals from the judgment of sentence

entered in the Philadelphia County Court of Common Pleas following his

convictions, after a jury trial, for second degree murder,[1] robbery,[2]

possession of a firearm without a license,[3] possession of a firearm on the

streets of Philadelphia,[4] and possession of an instrument of crime.[5]   He

challenges the weight of the evidence.  We affirm.

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. § 2502(b).

[2] 18 Pa.C.S. § 3701.

[3] 18 Pa.C.S. § 6106.

[4] 18 Pa.C.S. § 6108.

[5] 18 Pa.C.S. § 907.

We adopt the facts and procedural history set forth by the trial court's opinion. *See* Trial Ct. Op., 11/30/15, at 1-6. On May 1, 2015, the trial court sentenced Appellant to the mandatory sentence of life in prison for the murder charge. Appellant filed post-sentence motions challenging, *inter alia*, weight of the evidence, which the trial court denied on August 25, 2015. The instant timely appeal followed wherein Appellant raises the following single issue:

> Did the trial court err in denying Appellant's post-sentence Motion because Appellant's conviction is against the weight of the evidence in that all of the evidence against Appellant was circumstantial and speculative and did not surpass the reasonable doubt standard?

Appellant's Brief at 4.

Appellant argues that his conviction was against the weight of the evidence because no eyewitness testimony connected him to the murder and any DNA, fingerprint, or blood splatter evidence against him was either nonexistent or easily explained. He also avers that the main witness against him, Jamillah Reed, was not credible as she was "an admitted liar and thief." *Id.* at 10-11.

When considering challenges to the weight of the evidence, we apply the following precepts:

> The weight of the evidence is exclusively for the finder of fact[,] who is free to believe all, none or some of the evidence and to determine the credibility of witnesses.

Appellate review of a weight claim is a review of the exercise of discretion, not the underlying question of whether the verdict is against the weight of the evidence. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice.

*Commonwealth v. Talbert*, 129 A.3d 536, 545-46 (Pa. Super. 2015) (internal quotation marks and citations omitted). Further, "[i]n order for a defendant to prevail on a challenge to the weight of the evidence, the evidence must be so tenuous, vague and uncertain that the verdict shocks the conscience of the court." *Id.* at 546 (internal quotation marks and citation omitted).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Glenn B. Bronson, we conclude Appellant's issue merits no relief. The trial court's opinion comprehensively discusses and properly disposes of the question presented. *See* Trial Ct. Op. at 7-14 (finding the substantial evidence presented fully supported Appellant's conviction and the verdict was not contrary to the weight of the evidence where (1) the testimony of Reed, establishing the motive of a drug transaction gone wrong, was credible; (2)

- 3 -

Appellant could not be excluded as a DNA contributor to evidence found in the victim's pockets; (3) a Facebook video established that Appellant had been in possession of the same distinctive type of ammunition used to kill the victim one week prior to the crime; (4) phone records established that Appellant was the last person to call the victim prior to the murder; and (5) Appellant stated to police that "if he told [police] what happened [to the victim], his life would be over and that he would no longer see his grandfather."). Accordingly, we affirm on the basis of the trial court's opinion.

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/21/2016

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL TRIAL DIVISION

COMMONWEALTH OF          :        CP-51-CR-0001673-2014
PENNSYLVANIA

CP-51-CR-0001673-2014 Comm. v. Whitmire, Michael
Opinion

v.

|||||||||||||||||||||||||||||||||
7375373441

MICHAEL WHITMIRE

**FILED**

NOV 3 0 2015

**Post Trial Unit**

OPINION

BRONSON, J.                                                 November 30, 2015

On May 1, 2015, following a jury trial before this Court, defendant Michael Whitmire was convicted of one count each of second-degree murder (18 Pa.C.S. § 2502), robbery (18 Pa.C.S. § 3701), possession of a firearm without a license (18 Pa.C.S. § 6106), possession of a firearm on the streets of Philadelphia (18 Pa.C.S. § 6108), and possessing an instrument of crime (18 Pa.C.S. § 907). The Court immediately imposed the mandatory sentence of life in prison for the murder charge (18 Pa.C.S. § 1102(b)). Defendant filed post-sentence motions, which the Court denied on August 25, 2015.

Defendant has now appealed from the judgment of sentence entered by the Court on the grounds that: 1) the evidence was insufficient to support the verdicts for robbery and second-degree murder; and 2) the verdicts were against the weight of the evidence.[1] Statement of Errors Complained of on Appeal ("Statement of Errors") at ¶¶ 1-2. For the reasons set forth below, defendant's claims are without merit and the judgment of sentence should be affirmed.

---

[1] Defendant's claims have been reordered for ease of analysis.

## I. FACTUAL BACKGROUND

At trial, the Commonwealth presented the testimony of Philadelphia Police Detective John McNamee, Philadelphia Police Officers Jeffrey Holden, Tiffany Richardson, and Norman DeFields, Pennsylvania Attorney General's Office Special Agent Patrick Mangold, Associate Medical Examiner Dr. Bruce Wainer, Jamillah Reed, Sabrina Royals, Natalie Young, Patrick Raytik, Lissette Vega, and Donald Price. Defendant did not present any testimony. Viewed in the light most favorable to the Commonwealth as the verdict winner, the evidence established the following.

Throughout 2012, Jamillah Reed obtained crack cocaine from Antiquon Greer (the decedent). N.T. 4/28/15 at 66-68.[2] Greer operated his drug dealing business as a delivery service, and would drive to his purchasers in a red minivan in order to deliver their ordered drugs. N.T. 4/28/15 at 68, 219-220. To buy her drugs, Reed would call or text Greer and arrange a location where they would meet. N.T. 4/28/15 at 68-70, 219-220.

Sometime in the month of January, 2013, Reed met defendant through the online website "Talking.com." N.T. 4/28/15 at 70. Reed and defendant talked about meeting to use crack cocaine and have sex. N.T. 4/28/15 at 71. On January 19, 2013, at approximately 6:00 p.m., defendant called Reed and told her that he was near her location and wanted to meet up that day. N.T. 4/28/15 at 75, 77. Reed met with defendant and went with him to his grandfather's home at 12th Street and Fairmount Avenue. N.T. 4/28/15 at 75-77. Reed then contacted Greer to buy $100 of crack cocaine, to be paid for by defendant. N.T. 4/28/15 at 78-80. A short time later, Greer arrived at the Fairmount location in his red minivan and Reed went outside to make the deal. N.T. 4/28/15 at 81. Reed then went back into the home and she and defendant smoked the crack cocaine. N.T. 4/28/15 at 83-84, 224. Later that night, into the early morning hours,

---

[2] Greer was also identified as Ant. N.T. 4/28/15 at 66.

2

defendant provided another $100 to Reed, who called Greer to purchase more drugs. N.T. 4/28/15 at 84. During this second phone call, Greer told Reed to give defendant his phone number, so that defendant could call Greer for additional drugs himself. N.T. 4/28/15 at 86. Reed again met with Greer a short time later outside the Fairmount home, although defendant also went outside and witnessed this second transaction. N.T. 4/28/15 at 85, 226. Reed and defendant then returned to the home. N.T. 4/28/15 at 86.

At approximately 4:00 a.m. the next morning, January 20, 2013, defendant became nervous that his grandfather would return home, so he and Reed decided to go to the Carlyle Hotel, located a short distance from the Fairmount home. N.T. 4/28/15 at 86-89. Sometime later that afternoon, after arriving at the hotel and smoking more cocaine, defendant asked Reed to call Greer again for another drug purchase. N.T. 4/28/15 at 91; 4/29/15 at 54. Greer told Reed that he would come down to the hotel, but that Reed would need to make a larger purchase because Greer would have to go to work and would be unavailable to make additional drug runs that day. N.T. 4/28/15 at 91-92. Reed relayed this information to defendant, who stated that he would purchase $300 worth of cocaine, but that he would have to return to the Fairmount house to get the money to pay for the larger purchase. N.T. 4/28/15 at 92-93. Defendant then left the hotel, purportedly to get the money from the Fairmount home, while Greer headed to the hotel. N.T. 4/28/15 at 94, 228-229.

Approximately ten to fifteen minutes after defendant left the hotel, defendant called Reed and asked her to call Greer and have Greer meet defendant at the Fairmount home for the transaction. N.T. 4/28/15 at 95. Reed called Greer, who agreed to meet defendant. N.T. 4/28/15 at 95-96. Defendant, meanwhile, contacted Greer via the landline telephone at the Fairmount home at 5:18 p.m. Reed attempted to call Greer several times awaiting defendant's return, with

3

no response from Greer. N.T. 4/28/15 at 97. Sometime later that evening, defendant returned to the hotel sweating and "look[ing] deranged." N.T. 4/28/15 at 97-98. Defendant then asked Reed: "Why your friend ain't never come pick me up? Where is he at? He never came and got me." N.T. 4/28/15 at 98. Reed again attempted to contact Greer, with no response. N.T. 4/28/15 at 98; 4/29/15 at 56. After lying on the bed for approximately five minutes, defendant jumped up and said "Did you hear that?" claiming to have heard a gunshot. N.T. 4/28/15 at 98-99.

Sometime after 6:30 p.m., Reed stated that she was going to leave the hotel to get a pack of cigarettes. N.T. 4/28/15 at 99. Defendant told Reed that he would go get the cigarettes and left the hotel, but did not return. N.T. 4/28/15 at 99. When Reed called defendant to find out why he did not return, defendant stated that he was at his house and that it was too cold to come back to the hotel. N.T. 4/28/15 at 99. Reed then hung up on defendant, gathered her things, and left the hotel. N.T. 4/28/15 at 100. As she exited the hotel, Reed saw police activity in the area, including police blocking a van. N.T. 4/28/15 at 100.

Late that evening, at approximately 7:42 p.m., Officer Jeffrey Holden was on routine patrol in the area of Ogden Street and Carlisle Street in Philadelphia, one block south of the hotel, when he noticed a parked car with a black man behind the wheel, apparently sleeping. N.T. 4/27/15 at 87-89, 102. All doors to the vehicle were closed. N.T. 4/27/15 at 98, 100; 4/28/15 at 15-16. Officer Holden approached the vehicle and noticed that the man, later identified as Greer, had a bullet wound to his face and neck. N.T. 4/27/15 at 89. Officer Holden alerted additional police resources and medical personnel, who pronounced Greer dead at the scene. N.T. 4/27/15 at 89, 99. Later medical investigation revealed that the bullet that killed Greer penetrated Greer's left internal carotid artery, killing him within minutes. N.T. 4/28/15 at

4

203, 206. Medical examination also revealed that the gun that was used to shoot Greer was located less than a foot away from Greer's head when it fired. N.T. 4/28/15 at 210. Greer's front pant pockets had been turned out and Greer had a pack of cocaine clenched in his left fist. N.T. 4/28/15 at 20, 34. Police found two credit cards, a photo identification, and $6 in Greer's back right pocket. N.T. 4/29/15 at 11.

Police recovered one fired Hornady .45 caliber cartridge case from inside the vehicle. N.T. 4/28/15 at 14, 34; 4/30/15 at 20. Police also recovered one fired projectile outside the vehicle, consistent with the Hornady Critical Defense FTX type cartridge. N.T. 4/28/15 at 14, 19; 4/30/15 at 21. Blood was also found outside the vehicle, directly under where the driver side door was positioned when opened, indicating that someone had opened the door before police arrived at the scene. N.T. 4/28/15 at 16, 18, 31-32. Police detectives obtained a search warrant for Greer's phone records, which lead detectives to obtain a search warrant for Reed's cell phone. N.T. 4/29/15 at 33-39. Based on these phone records, police contacted Reed. N.T. 4/29/15 at 38-40.

On April 2, 2013, Reed provided a statement to police. N.T. 4/28/15 at 102, 121-124. Reed further provided police with her cell phone number as well as phone numbers for Greer and defendant. N.T. 4/28/15 at 103-104. Reed also identified defendant as the person she was with on the day that Greer was shot. N.T. 4/28/15 at 128. Police obtained additional search warrants for defendant's phone records, which showed that a call had been made to Greer on January 20, 2013, from the Fairmount home landline just prior to Greer's death. N.T. 4/29/15 at 41-44.

Police contacted defendant on April 8, 2013, and asked him to come in to police headquarters. N.T. 4/29/15 at 59. However, despite agreeing to come in, defendant did not meet with police at the scheduled time. N.T. 4/29/15 at 60. On April 19, 2013, defendant contacted

5

his cousin to ask if defendant had any outstanding warrants because "homicide keep running around asking questions about me." N.T. 4/29/15 at 69-71.

On May 2, 3, and 22, 2013, defendant contacted Reed via Facebook and asked Reed to call him to talk about Greer. N.T. 4/28/15 at 130, 132-136. When Reed did so, defendant told Reed that he had seen detectives at Reed's house and that Greer had been killed. N.T. 4/28/15 at 136. A short time after talking with defendant on May 22, Reed saw a video that defendant had posted on his Facebook page where defendant was handling a gun. N.T. 4/28/15 at 137. The firearm in the video was a Glock Model 21 .45 caliber semiautomatic pistol. N.T. 4/30/15 at 33, 36. The video also showed defendant handling Hornady Critical Defense FTX ammunition. N.T. 4/30/15 at 39-40.

Police executed a search warrant for defendant's Facebook account on June 7, 2013, and based on the handgun video, defendant was arrested on firearm charges on June 27, 2013. N.T. 4/29/15 at 66, 76. When questioned by police concerning the video, defendant admitted that he was the person in the Facebook video and that he possessed the firearm. N.T. 4/29/15 at 83. Subsequent investigation showed that the video was created on January 13, 2013, one week prior to Greer's murder. N.T. 4/29/15 at 188-190. When defendant was questioned by police concerning Greer's murder, defendant stated that "if he told [police] what happened, that his life would be over and that he would no longer see his grandfather." N.T. 4/29/15 at 83, 86. He also stated that he was in the area at the time of the murder with a female, and that he was purchasing narcotics from Greer. N.T. 4/29/15 at 98.

6

## II. DISCUSSION

### A. *Sufficiency of the Evidence*

Defendant claims that the Commonwealth's evidence was legally insufficient to support the verdicts for robbery and second-degree murder "as there was no eyewitness testimony and no evidence connecting [defendant] to the process whereby Decedent's pant pockets were turned out." Statement of Errors at ¶ 2. This claim is without merit.

In considering a challenge to the sufficiency of the evidence, the Court must decide whether the evidence at trial, viewed in the light most favorable to the Commonwealth, together with all reasonable inferences therefrom, could enable the factfinder to find every element of the crimes charged beyond a reasonable doubt. *Commonwealth v. Walsh*, 36 A.3d 613, 618 (Pa. Super. 2012) (quoting *Commonwealth v. Brumbaugh*, 932 A.2d 108, 109 (Pa. Super. 2007)). In making this assessment, a reviewing court may not weigh the evidence and substitute its own judgment for that of the factfinder, who is free to believe all, part, or none of the evidence. *Commonwealth v. Ramtahal*, 33 A.3d 602, 607 (Pa. 2011). "[A] mere conflict in the testimony of the witnesses does not render the evidence insufficient..." *Commonwealth v. Montini*, 712 A.2d 761, 767 (Pa. Super. 1998). The Commonwealth may satisfy its burden of proof entirely by circumstantial evidence. *Ramtahal*, 33 A.3d at 607. "If the record contains support for the verdict, it may not be disturbed." *Commonwealth v. Adams*, 882 A.2d 496, 499 (Pa. Super. 2005) (quoting *Commonwealth v. Burns*, 765 A.2d 1144, 1148 (Pa. Super. 2000), *appeal denied*, 782 A.2d 542 (Pa. 2001)).

### 1. Robbery

"A person is guilty of robbery if, in the course of committing a theft, he [*inter alia*]: ... inflicts serious bodily injury upon another." 18 Pa.C.S. § 3701(a)(1)(i). "An act shall be deemed

7

'in the course of committing a theft' if it occurs in an attempt to commit theft or in flight after the attempt or commission." 18 Pa.C.S. § 3701(a)(2). The evidence in this matter clearly established that defendant committed a robbery on January 20, 2013.

Jamillah Reed testified concerning the events leading up to Greer's murder. Reed stated that she met defendant on the evening of January 19, 2013, and began using drugs in defendant's grandfather's home on Fairmount Avenue. N.T. 4/28/15 at 75-77. Reed testified that she contacted Greer twice while she and defendant were at the Fairmount home in order to purchase drugs, and that Greer came to the house in order to deliver the drugs. N.T. 4/28/15 at 77-81, 84. Reed testified that, during the second purchase, defendant accompanied her outside the home and witnessed the exchange. N.T. 4/28/15 at 85. Reed also testified that Greer asked her to provide his phone number to defendant during this second drug purchase. N.T. 4/28/15 at 86.

Reed further testified that she made a third call to Greer, at defendant's request, later in the evening of January 20, 2013, while she and defendant were in the Carlyle Hotel a few blocks from the Fairmount home. N.T. 4/28/15 at 89. Reed testified that defendant stated that he would purchase three hundred dollars worth of drugs, but that he needed to return to the Fairmount home in order to retrieve the money needed for the purchase. N.T. 4/28/15 at 91-93. According to Reed, defendant called her approximately fifteen minutes after defendant had left the hotel and asked her to call Greer and have him meet defendant at the Fairmount home in order to conduct the drug transaction. N.T. 4/28/15 at 95. As defendant had witnessed the second drug transaction earlier that day, defendant knew that Greer drove a red minivan. Reed testified that she called Greer to change the drug transaction location and that Greer agreed to meet defendant. N.T. 4/28/15 at 95-96.

8

Reed testified that defendant eventually returned to the hotel room, "look[ing] deranged...like somebody threw a bucket of water on him. He didn't look normal. He didn't look like the way he looked when he left." N.T. 4/28/15 at 97-98. Reed testified that defendant had claimed that Greer never arrived for the drug deal. N.T. 4/28/15 at 96-98. Reed also testified that she was not able to get in touch with Greer since his last text to her. N.T. 4/28/15 at 96-98. Reed further testified that defendant lay on the bed for approximately five minutes after returning to the hotel before jumping up from the bed and declaring that he heard a gunshot. N.T. 4/28/15 at 98-99. Reed testified that, soon thereafter, defendant offered to buy Reed a pack of cigarettes, left the hotel, and did not return. N.T. 4/28/15 at 99. Reed then testified that she called defendant to see where he had gone and, when he stated he was back at the Fairmount residence, she left the hotel sometime around 7:00 p.m. N.T. 4/28/15 at 99-100. Reed testified that she saw police activity in the area around a van near the hotel after she left. N.T. 4/28/15 at 100.

Police investigation at the crime scene established compelling evidence of a robbery. Greer's body was recovered inside his vehicle on a desolate street in the area of Carlisle Street and Ogden Street, approximately a block away from the Carlyle Hotel where defendant and Reed were staying. N.T. 4/27/15 at 88-89. Greer had been shot once in the face, at close range, with a .45 caliber Glock style semiautomatic pistol. N.T. 4/27/15 at 89; 4/28/15 at 202-206, 210; 4/30/15 at 20-21. Police recovered the .45 caliber Hornady fired cartridge case inside the vehicle and a bullet projectile outside of the vehicle, which was consistent with a .45 caliber Hornady Critical Defense FTX cartridge. N.T. 4/28/15 at 13-14; 4/30/15 at 20-21, 26. While the initial responding officer, Jeffrey Holden, testified that the car doors were closed when he approached Greer, and that he never opened the car doors prior to the scene being documented by investigators, blood was found outside the vehicle, directly under where the driver side door was

9

positioned when opened, indicating that someone had opened the door before police arrived at the scene. N.T. 4/27/15 at 100; 4/28/15 at 15-16, 18, 31-32. In addition, Greer's front pants pockets had been turned inside out. N.T. 4/28/15 at 20, 34. Subsequent DNA analysis of these pockets could not exclude defendant as a contributor to the DNA found within them. N.T. 4/29/15 at 159-160, 163-164. Police also discovered gunshot residue in the lining of these pockets, indicating that whoever had shot Greer had also put their hands into Greer's front pockets. N.T. 4/29/15 at 171.

Reed also testified concerning events after the murder. She stated that she was contacted by police on April 2, 2013, and that she provided police with defendant's name and phone numbers. N.T. 4/28/15 at 121-122, 128-129. Reed also testified that defendant contacted her several times after she began talking with police, asking to talk to her about Greer. N.T. 4/28/15 at 130-131, 133-136. Reed further testified that she saw a video of defendant posted on his Facebook account where defendant was in possession of a firearm. N.T. 4/28/15 at 137-142. Subsequent analysis of this video showed that the video was filmed with defendant's cell phone on January 13, 2013, one week before Greer's murder. N.T. 4/29/15 at 188-189. In the video, defendant can be seen handling a .45 caliber Glock semi-automatic pistol and .45 caliber Hornady Critical defense FTX ammunition. N.T. 4/30/15 at 33, 36-40.

Detective John McNamee testified that he obtained warrants for the cell phone numbers provided by Reed and that both numbers were listed under defendant's name. N.T. 4/29/15 at 41-44. These phone records indicated that one of these cell phones was associated with the landline telephone number at the Fairmount home, which defendant provided as his primary address. N.T. 4/29/15 at 43-44. McNamee testified that defendant contacted Greer multiple times in the afternoon and evening of January 20, 2013. N.T. 4/29/15 at 51-53. McNamee also

10

testified that someone called Greer from the landline at the Fairmount residence at 4:37 p.m. and again at 5:18 p.m. on January 20. The 5:18 p.m. phone call was the last phone call answered by Greer prior to being found dead in his car. N.T. 4/29/15 at 55.

Detective McNamee testified that defendant was arrested on firearm possession charges stemming from the Facebook video and brought into police headquarters for questioning. N.T. 4/29/15 at 76. McNamee testified that defendant admitted to police that he was the person in the Facebook video and that he possessed the firearm. N.T. 4/29/15 at 83. McNamee further testified that, when defendant was questioned about Greer's murder, defendant stated that "if he told [police] what happened, that his life would be over and that he would no longer see his grandfather." N.T. 4/29/15 at 83, 86. McNamee also testified that defendant stated that he was in the area at the time of the murder, with Reed, and that he was purchasing narcotics from Greer. N.T. 4/29/15 at 98. McNamee also testified that defendant contacted his cousin via Facebook prior to his arrest on the firearm charges in order to determine if he had any outstanding warrants because "homicide keep running around asking questions about me." N.T. 4/29/15 at 69-71.

Accordingly, there was compelling evidence for a fact-finder to conclude that defendant robbed Greer in the late afternoon of January 20, 2013. Reed's testimony established that Greer was killed during the time that he was scheduled to deliver $300 worth of cocaine to defendant. While the previous two drug exchanges were made from Greer to Reed, this time defendant arranged to have Greer deliver the drugs directly to defendant at defendant's Fairmount home while Reed remained at the Carlyle Hotel. Telephone records established that a call was made from that Fairmount residence to Greer shortly before Greer was found dead in his vehicle in an abandoned section of the neighborhood, providing strong circumstantial evidence that defendant

11

called Greer to change the location of the transaction. After the deal was supposed to have been done, defendant returned to Reed at the hotel, sweating and "looking deranged," claiming Greer never showed up. Defendant then bizarrely claimed to hear a gunshot, left the hotel for cigarettes, and never returned. All of this showed that defendant had motive and opportunity to rob Greer and behaved in a manner demonstrating consciousness of guilt.

Moreover, the remaining evidence convincingly established both the commission of a robbery and defendant's identity as the perpetrator. The medical and ballistics evidence proved that Greer was shot at close range by a .45 caliber Glock semi-automatic with distinctive Hornady Critical Defense FTX ammunition. The Facebook video showed that defendant had been in possession of the same type of ammunition, and a handgun that could fire it, only one week prior to the shooting. Greer's pockets were turned inside out, with gunpowder residue on the pocket lining after coming into contact with the shooter's hands as he went through the pockets after shooting Greer. Defendant could not be excluded as a contributor to the DNA evidence found in the pockets. Blood was located outside the vehicle, directly under where the driver side door was located when opened, though police never opened the car door prior to the arrival of crime scene investigators. This evidence was sufficient to establish that defendant opened the driver side door after shooting Greer and went through Greer's pockets in an attempt to steal drugs or money. Finally, when contacted by police, defendant stated that if he told police about what happened to Greer, "his life would be over and that he would no longer see his grandfather." N.T. 4/29/15 at 83. This evidence was clearly sufficient to allow a reasonable factfinder to conclude that defendant was guilty of robbery.

12

## 2. Second-Degree Murder

"'A criminal homicide constitutes murder of the second degree when it is committed while defendant was engaged as a principal or an accomplice in the perpetration of a felony.'" *Commonwealth v. Knox*, 50 A.3d 732, 739 (Pa. Super. 2012), *appeal denied*, 69 A.3d 601 (Pa. 2013) (citing 18 Pa.C.S. § 2502(b)). "The 'perpetration of a felony' is defined as: 'The act of the defendant in engaging in or being an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit robbery, rape, or deviate sexual intercourse by force or threat of force, arson, burglary or kidnapping.'" *Id.* The malice required for second-degree murder may be inferred by the factfinder from the underlying felony. *See Commonwealth v. Lambert*, 795 A.2d 1010, 1023 (Pa. Super.), *appeal denied*, 805 A.2d 521 (Pa. 2002).

As described above, the evidence clearly established that defendant shot Greer once in the face during the commission of a robbery. Dr. Bruce Wainer testified that Greer died as a result of a single perforating gunshot wound to the head, which perforated Greer's carotid artery. N.T. 4/28/15 at 202-203, 211-212. Accordingly, the evidence was plainly sufficient to support the factfinder's verdict of second-degree murder.

### B. *Weight of the Evidence*

Defendant next contends that the jury's verdict of guilt is against the weight of the evidence because there was no eyewitness testimony or forensic evidence connecting defendant to the murder and because witness Jamillah Reed was the likely perpetrator. Statement of Errors at ¶ 2. This claim is without merit.

It is well-established that a new trial may only be granted by the trial court where the verdict was so contrary to the weight of the evidence as to "shock one's sense of justice." *Commonwealth v. Rossetti*, 863 A.2d 1185, 1191 (Pa. Super. 2004), *appeal denied*, 878 A.2d 864

13

(Pa. 2005) (quoting *Commonwealth v. Hunter*, 554 A.2d 550, 555) (Pa. Super. 1989)). Moreover, credibility determinations are solely within the province of the fact-finder, and an appellate court may not reweigh the evidence and "substitute its judgment for that of the finder of fact." *Commonwealth v. Taylor*, 63 A.3d 327 (Pa. Super. 2013) (quoting *Commonwealth v. Shaffer*, 40 A.3d 1250, 1253 (Pa. Super. 2012)). In considering a claim that the trial court erred in refusing to find that a verdict was against the weight of the evidence, "appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim." *Taylor*, 63 A.3d at 327 (quoting *Shaffer*, 40 A.3d at 1253).

The evidence outlined above plainly established that defendant committed the crimes of which he was convicted. While defendant attempts to shift the blame of Greer's murder onto Reed, there is no evidence to suggest that Reed perpetrated this crime. Because the evidence fully supported the verdict, the Court did not abuse its discretion in denying defendant's post-sentence motion.

## III. CONCLUSION

For all of the foregoing reasons, the Court's judgment of sentence should be affirmed.

BY THE COURT:

_____
GLENN B. BRONSON, J.

14

Commonwealth v. Michael Whitmire   CP-51-CR-0001673-2014
Type of Order: 1925(a) Opinion

## PROOF OF SERVICE

I hereby certify that I am this day serving the foregoing Court Order upon the person(s), and in the manner indicated below, which service satisfies the requirements of Pa.R.Crim.P.114:

**Defense Counsel/Party:**

    Stephen O'Hanlon, Esquire
    1500 JFK Blvd.
    Suite 1850
    Philadelphia, PA 19102

Type of Service:  ( ) Personal (**X**) First Class Mail ( ) Other, please specify:

**District Attorney(s):**

    Hugh J. Burns, Jr., Esquire
    Chief, Appeals Unit
    Philadelphia District Attorney's Office
    Three South Penn Square
    Philadelphia, PA 19107

Type of Service  () Personal (**X**) First Class Mail ( ) Other, please specify:

**Additional Counsel/Party:**

    Joseph D. Seletyn, Esquire
    Prothonotary
    Office of the Prothonotary – Superior Court
    530 Walnut Street, Suite 315
    Philadelphia, PA 19106

Type of Service:  ( ) Personal (**X**) First Class Mail ( ) Other, please specify:

Dated: **November 30, 2015**

Jonathon M. Frisby
Law Clerk to Hon. Glenn B. Bronson